IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs April 9, 2002

## STATE OF TENNESSEE v. PERCY PEREZ FARRIS

**Appeal from the Circuit Court for McNairy County**
**No. 1339 A     Jon Kerry Blackwood, Judge**

_____

**No. W2001-01787-CCA-R3-CD  - Filed May 8, 2002**

_____

The Defendant, Percy Perez Farris, was convicted by a jury of attempt to commit first degree premeditated murder and especially aggravated robbery. The trial court sentenced the Defendant to twenty-five years for each offense, to be served concurrently in the Department of Correction. In this direct appeal the Defendant raises the following issues: (1) whether the trial court erred in denying the Defendant's motion to change venue; (2) whether the trial court erred in refusing to suppress identification testimony; (3) whether the trial court erred in refusing to suppress evidence concerning the victim's blood; (4) whether the evidence is sufficient to support the convictions; and (5) whether cumulative error requires a new trial. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which DAVID G. HAYES and JAMES CURWOOD WITT, JR., JJ.joined.

Karen T. Fleet, Bolivar, Tennessee, for the appellant, Percy Perez Farris.

Paul G. Summers, Attorney General and Reporter; P. Robin Dixon, Jr., Assistant Attorney General; Elizabeth Rice, District Attorney General; and Jerry W. Norwood, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Shortly before midnight on May 14, 2000, the victim, Barbara Young, was working as the assistant manager and desk clerk at the Days Inn Motel in Selmer, Tennessee. Ms. Young had retired to her bedroom adjacent to the office when she heard the buzzer indicating customers. Ms. Young got up and went into the office area. She saw a black man standing at the window and hit the button to allow him in. He and a white man entered. She had never seen either man before.

The white man came up to the counter as if to check in. The black man came around behind the counter, and had a gun in his hand. He told Ms. Young to give him money. Ms. Young retreated

to the adjacent bedroom in an attempt to escape. The black man followed her and began stabbing her. Ms. Young continued to try to get to a door leading outside but the black man thwarted her efforts to escape and continued stabbing her. Finally, Ms. Young fell down and "played dead." The attacker kicked her a few times, then returned to the counter area. Ms. Young saw the men leave with the cash register drawer, which contained about $300. Ms. Young was able to call 911, and the police and medical personnel arrived shortly thereafter. Ms. Young had been stabbed thirty times; she identified the Defendant in court as her attacker.

Co-defendant Sean Singleton testified that the Defendant drove the two of them in the Defendant's car to the Days Inn. When they entered the office, Singleton recognized the victim from having seen her previously at the motel. Singleton testified that the Defendant pulled a gun and pushed the victim into the bedroom, shutting the door. Singleton heard the victim screaming, but did not see what was happening. When the screaming stopped, the Defendant came out and got the cash register drawer. The two men then left, with the Defendant again driving.

The two men drove to Singleton's mother's house. On the way, Singleton threw the cash register drawer away, and the Defendant removed his clothes and threw them on the side of the road. When the men arrived at Singleton's mother's house, the Defendant washed his hands and told Singleton to wipe off the car door, the steering wheel, and the gearshift. Singleton did not do as directed. The men left the house and drove to the trailer where Singleton lived with his wife. Singleton went to bed shortly after their arrival.

Frank Evans, Singleton's half-brother, was at Singleton's mother's house when the Defendant and Singleton arrived after the attack. Evans testified that he saw blood on the Defendant's hands. The Defendant told Evans that he had been in a fight in Mississippi and stabbed a man. Evans heard the Defendant tell Singleton to wipe off the car door handle.

Carrie Singleton, Singleton's wife, testified that her husband and the Defendant had left the trailer at about 8:30 that evening in the Defendant's car. The Defendant was wearing black pants and Mrs. Singleton's Taco Bell dog shirt. Singleton told her that they had to go collect some money from a man, and that something was wrong if they weren't back by midnight. The men returned at about 2:30 a.m., according to Mrs. Singleton. The Defendant was wearing purple pants and a white tee shirt. Singleton was "pale" when he came in. The Defendant told Mrs. Singleton that they had "beat the man down" because he didn't have the money they were owed. She testified that she didn't see any blood.

Mrs. Singleton testified that she had spoken with the Defendant since his arrest, and that he told her "everybody needed to keep their mouth shut." The Defendant told her that "if [Singleton] testified against him that [Singleton] would be killed." Mrs. Singleton testified that the Defendant made this threat on the Saturday before trial.

The morning after the attack, police officers arrived at Singleton's trailer and Singleton confessed his participation in the crimes. The officers seized some clothing from Singleton's

bedroom, including the shirt that Singleton wore during the attack. This shirt bore a bloodstain. Singleton testified that he was going to plead guilty to aggravated assault in connection with the attack.

Officer Mike Turner collected a portion of the handle on the driver's door of the car the Defendant had been driving, as well as the handle strap from inside the driver's door and the gearshift knob. Each of these items bore a bloodstain. These items were turned over to Investigator Roger Rickman, the chief investigating officer.

TBI agent Chad Johnson testified that he tested the blood stains on the shirt, door handle, door strap, and gearshift knob. These bloodstains matched a blood sample from the victim that Johnson had been provided by Investigator Rickman.

Jesse Farris, the Defendant's father, testified on the Defendant's behalf, explaining that he had loaned the Defendant $200 the day before the attack. He also stated that the Defendant was twenty-eight years old.

**VENUE**

On the morning of trial, the Defendant made a motion for change of venue, "based on the pretrial publicity of this cause." The transcript of the trial contains no references to, or copies of, any particular pretrial publicity. The written motion contained in the technical record references a television news story, a front page story in the Selmer newspaper, and a story in the Corinth newspaper. Attached to the motion is a copy of an unidentified newspaper article about the crimes. The record contains no other evidence of pretrial publicity. The trial court overruled the motion, "base[d] on the reaction of the Voir Dire." The trial transcript does not include a copy of the voir dire.

We first note that the decision of whether to grant a request for change of venue is left to the sound discretion of the trial court and will not be reversed on appeal absent an affirmative and clear abuse of that discretion. See State v. Vann, 976 S.W.2d 93, 114 app. (Tenn. 1998). Moreover, the Defendant must demonstrate that the jurors were biased or prejudiced against him before his convictions will be overturned on appeal. See State v. Melson, 638 S.W.2d 342, 361 (Tenn. 1982). "The test is 'whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity.'" State v. Crenshaw, 64 S.W.3d 374, 386 (Tenn. Crim. App. 2001) (citation omitted).

The Defendant has failed to demonstrate to this Court that the jurors who sat on his trial were biased or prejudiced against him as a result of the alleged pretrial publicity. "In the absence of a complete record, we must presume that the trial court correctly denied the motion for a change of venue." Id. at 387. Accordingly, we find this issue to be without merit.

## IDENTIFICATION TESTIMONY

Prior to trial, the Defendant moved to suppress the victim's identification of him. After a hearing, the trial court denied the Defendant's motion. The Defendant now argues that the trial court thereby committed reversible error.

When the police first arrived on the crime scene, the only description which Ms. Young was able to provide of her attackers was a black male and a white male.[1] That evening while she was in the hospital, Ms. Young briefly saw a photograph of the Defendant on a news cast concerning the attack. On August 11, 2000, the police, together with the Defendant's lawyer, conducted a physical line-up in the courthouse for Ms. Young's perusal. Six men, several of whom had been selected by defense counsel, entered the courtroom together for Ms. Young to view. All six men then left the room, and each one then reentered the room separately for Ms. Young's observation. After all of the men had again left the room, Ms. Young requested to see Numbers Three and Four again. All six men were again brought into the courtroom. After they left, according to Investigator Rickman, Ms. Young stated, "I might be making a mistake, but I am going to pick one." Investigator Rickman testified that "she said it was between Number 3 and Number 4, but she thought it was Number 4." Number 4 was the Defendant.

On August 17, 2000, Ms. Young participated in a photographic line-up, where she again identified the Defendant as her attacker. In the Defendant's photograph, his appearance was different than on the day he participated in the line-up. According to Investigator Rickman, on the day of the line-up, the Defendant was not wearing his glasses and had his hair slicked back. In his photograph, he was wearing glasses and had a long Afro. Investigator Rickman admitted that the Defendant was the only person wearing wire-rimmed glasses and a long Afro in the photographic line-up. He also admitted that the Defendant's head appeared larger in his photograph than did the heads of the other men. He further admitted that four of the photographs were of the same two men (neither of which was the Defendant).

When questioned at trial about her pre-trial identifications of the Defendant, Ms. Young testified that the picture she had seen of the Defendant on television had nothing to do with her picking the Defendant out of the line-ups, but she admitted that the photograph of the Defendant used in the photographic line-up was similar to the photograph she had seen on television. She testified that she had "no doubt whatsoever" that she was not remembering her attacker based on the photograph she saw on television, and she explained that she had been face to face with the Defendant during the attack "several times." When asked about her remark during the physical line-up about the possibility of making a mistake, Ms. Young testified that she had "wanted to be 200 percent sure." She stated that when the men came back into the courtroom the final time, she "looked at them, [and] knew [she] had picked the right one."

---

[1] During direct examination, the prosecutor asked Ms. Young if "[a]t some point, . . . you g[a]ve the police a description of the people that came in, something physical or clothing or something?" Ms. Young answered, "[y]es, I did," but no further questions on this particular description were asked.

The Defendant argues that several factors tainted the victim's identifications of the Defendant, including her seeing his photograph on television before she had identified him; the fact that he was the only man in the photographic line-up that was wearing wire-rimmed glasses and a long Afro haircut; that his head appeared larger than the other men's in the photographic line-up; and that his photograph was located next to one of the duplicate photographs in the photo line-up.

This Court must uphold a trial court's factual findings on a motion to suppress unless the evidence preponderates otherwise. See State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). In reviewing the evidence, we may consider both the proof adduced at the suppression hearing and the proof adduced at trial. See State v. Henning, 975 S.W.2d 290, 299 (Tenn. 1998).

Our supreme court has provided that, "[t]o be admissible as evidence, an identification must not have been conducted in such an impermissibly suggestive manner as to create a substantial likelihood of irreparable misidentification." State v. Cribbs, 967 S.W.2d 773, 794 app. (Tenn. 1998) (citing Simmons v. United States, 390 U.S. 377 (1968)). In order to determine whether the identification was unnecessarily suggestive, we must examine the "totality of the circumstances existing at the time of the identification." Id. at 795 app., (citing Stovall v. Denno, 388 U.S. 293 (1967)). Factors determining whether an identification procedure was too suggestive to accept as reliable are:
> (1) the opportunity of the witness to view the accused at the time of the offense;
> (2) the witness's degree of attention;
> (3) the accuracy of the witness's prior description of the accused;
> (4) the level of certainty demonstrated by the witness at the confrontation; and
> (5) the time between the crime and the confrontation.
See Neil v. Biggers, 409 U.S. 188, 199 (1972).

In this case, the victim testified that the attack upon her lasted approximately ten minutes; thus, she had ample time to view her assailant. The lights were on in the counter area, and the television was on in the adjacent bedroom.[2] The victim testified that she was face to face with her attacker several times. While it is clear that the victim was frightened by the attack, she had the presence of mind to continue her attempts to flee and eventually determined that her best course of action was to pretend to be dead. The victim's rational attempts to save herself point to a high degree of attention paid during the attack.

The only description the victim gave of the Defendant in the record is "black male." However, she stated this description immediately after the attack while bleeding heavily and having difficulty breathing. The level of certainty demonstrated by Ms. Young at the physical line-up was not high. She expressed fear of making a mistake. However, she took her time before selecting the Defendant and chose carefully between him and one other individual. Her subsequent identification

---

[2]Ms. Jones testified that the counter lights shone into the bedroom during the attack. Singleton claimed that the bedroom door was shut during the attack.

of the Defendant from a photographic line-up was far more certain. Finally, the time between the crime and the confrontation was approximately three months.

In view of the totality of the circumstances, and in light of the Biggers factors, we agree with the trial court that Ms. Young's identifications of the Defendant were admissible. She testified that she "just glanced" at the Defendant's photograph on television, and that, at the time, she "didn't really care about seeing him or the TV." The physical line-up contained six men, several of whom where chosen by defense counsel. The victim took her time before choosing the Defendant from this group of six men. A few days later, she viewed a photographic line-up containing the photographs of ten men and again picked out the Defendant. She testified at trial that she was certain the Defendant was her attacker. The evidence does not preponderate against the findings which support the trial court's ruling, and this issue is therefore without merit.

Moreover, even if the trial court erred in refusing to suppress the victim's identification of the Defendant, the error is harmless. The Defendant's co-defendant testified that the Defendant had committed the attack upon the victim and got the cash register drawer. Frank Evans testified that he saw the Defendant later that night with blood on his hands, and he heard the Defendant tell Singleton to wipe off the car door handle. The Defendant's driver's side door handles, both interior and exterior, had blood on them, as did the gearshift knob. In sum, there was sufficient evidence adduced at trial to identify the Defendant as the assailant, even without Ms. Young's identifications of him. Any error in admitting Ms. Young's testimony was therefore harmless, and this issue is without merit.

## ADMISSIBILITY OF VICTIM'S BLOOD SAMPLE

The Defendant next contends that the trial court should have excluded testimony about the blood sample allegedly drawn from the victim because the State did not establish the sample's chain of custody. Investigator Rickman testified that he obtained a sample of the victim's blood "[f]rom the technician at the hospital that drew the standards." Investigator Rickman then delivered the sample to the TBI Crime Lab, where it was analyzed by forensic scientist and serologist Chad Johnson. Agent Johnson also analyzed the blood samples obtained from the Defendant's car and testified that the samples from the car matched the victim's blood sample. The Defendant points out, however, that neither the lab technician nor the victim testified about drawing the victim's blood, and that the chain of custody is thereby fatally flawed.

We first note that the Defendant did not object to the State's proof about the victim's blood sample during either Investigator Rickman's or Agent Johnson's testimony.[3] Instead, defense counsel waited until the State rested its case before asking that the trial court exclude evidence of Ms. Young's blood sample. The trial court overruled the Defendant's motion. We find that, in waiting to object until after the evidence was introduced, the Defendant has waived this issue. See,

---

[3]The Defendant refers in his brief to his "Motion to Exclude DNA/Blood Evidence of the alleged victim." The record before this Court contains no such written motion.

e.g., State v. Burton, 751 S.W.2d 440, 448 (Tenn. Crim. App. 1988) (failure to make contemporaneous objection to evidence resulted in waiver of issue); State v. Davis, 741 S.W.2d 120, 124 (Tenn. Crim. App. 1987) (failure to object to evidence "until after it was all placed before the jury" resulted in waiver of issue). See also Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.") The Defendant's failure to object during the State's proffer of this proof gave the trial court no opportunity to rule on this issue and gave the State no opportunity to cure any alleged omission in the chain of custody. The Defendant will therefore not now be heard to complain.

Moreover, this issue is without merit. Our Rule of Evidence 901(a) requires that evidence be authenticated or identified as a condition precedent to its admissibility. For tangible evidence, "a witness must be able to identify the evidence or establish an unbroken chain of custody." State v. Kilpatrick, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2001). The purpose of this "chain of custody" requirement is to "demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence." State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993). Absolute certainty of identification is not required, however. See Kilpatrick, 52 S.W.2d at 87. "Reasonable assurance, rather than absolute assurance, is the prerequisite for admission." Id. The issue addresses itself to the sound discretion of the trial judge, whose ruling will not be disturbed absent a clear abuse of that discretion. See Id.

Here, Investigator Rickman testified that he received a sample of the victim's blood from the technician that drew the blood. Testimony from a witness who saw the blood being drawn and handed over to Investigator Rickman would have satisfied more thoroughly the chain of custody requirement. In the context in which Investigator Rickman's testimony was given, however, we think that the testimony is sufficient to establish that the blood sample given to the TBI laboratory was taken from the victim.

Even if this evidence was admitted in error, however, we hold the error to be harmless. The victim identified the Defendant as her attacker. The Defendant's cohort identified the Defendant as the victim's attacker. Evans testified that he saw the Defendant with blood on his hands after the attack. Blood stains were found on the Defendant's car. Even without proof that the blood on the Defendant's car matched the victim's, the proof is sufficient to establish the Defendant as the victim's attacker. This issue is, therefore, without merit.

## SUFFICIENCY OF THE EVIDENCE

The Defendant next complains that the evidence is not sufficient to sustain his convictions. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because

conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

First degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation is defined as "an act done after the exercise of reflection and judgment," and "means that the intent to kill must have been formed prior to the act itself." Id. § 39-13-202(d). Premeditation does not require that the purpose to kill pre-existed in the accused's mind for any definite period of time. See id. However, "[t]he mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation." Id. An attempt to commit premeditated murder is accomplished when the accused, acting with premeditation and the intent to kill, engages in conduct which "constitutes a substantial step toward the commission of the offense." Id. § 39-12-101(a)(3).

The element of premeditation is a question of fact for the jury and may be established by proof of the circumstances surrounding the attempted killing. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Factors demonstrating the existence of premeditation include the use of a deadly weapon upon an unarmed victim, the particular cruelty of the (attempted) killing, and calmness immediately after the (attempted) killing. See id.

Here, the proof established that Defendant and his cohort entered the motel after buzzing to be admitted. The Defendant immediately went behind the counter and accosted the desk clerk, drawing a gun and demanding money. When the desk clerk sought to flee, the Defendant followed her into another room, drew a knife, and began repeatedly stabbing her. The Defendant stabbed the unarmed victim thirty times, not stopping until she fell to the floor and appeared lifeless. The Defendant then left, taking the cash register drawer with him. The Defendant and Singleton drove away, with the Defendant tossing his clothes and Singleton tossing the cash register drawer. The men drove to a house where the Defendant washed up, explaining that he had been in a fight, and told Singleton to wipe the blood off of his car.

These circumstances are sufficient to support the jury's conclusion that the Defendant acted with intent and premeditation to kill Barbara Young. The proof is therefore sufficient to support the Defendant's conviction of attempt to commit first degree premeditated murder, and this issue is accordingly without merit.

With respect to the Defendant's conviction for especially aggravated robbery, that offense is committed when the accused intentionally or knowingly takes property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon and causing serious bodily injury to the victim. See Tenn. Code Ann. § 39-13-403(a). Here, the proof at trial established that the Defendant and Singleton took approximately $300 from the victim after the Defendant repeatedly stabbed her with a knife. The victim was stabbed thirty times and had to be airlifted to a hospital in Jackson. She lost so much blood that she required transfusions. She spent at least one day in the intensive care unit of the hospital. "Serious bodily injury" is defined as including bodily injury which involves a substantial risk of death. See id. § 39-11-106(a)(34)(A). The proof in this case is sufficient to support the Defendant's conviction of especially aggravated robbery, and this issue is therefore without merit.

## CUMULATIVE ERROR

The Defendant contends in his final issue that he was "denied a fair trial by the combination of all of the errors previously mentioned." Our review and analysis of the Defendant's issues reveal no errors, cumulative or otherwise, requiring reversal.[4] This issue is therefore without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE

[4]Although not raised as an issue by the Defendant, this Court has sua sponte considered the trial court's instructions to the jury on lesser included offenses. The technical record includes a copy of the written jury charge, in which the jury was instructed on the crimes of attempt to commit first degree premeditated murder and the lesser included offense of attempt to commit second degree murder, and on especially aggravated robbery and the lesser included offense of aggravated robbery. The verdict forms also indicate that the jury was given the opportunity to consider these lesser included offenses. Nevertheless, the jury convicted the Defendant of the greatest offenses charged. Pursuant to State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998), we find no reversible error in the trial court's instructions to the jury on lesser included offenses.